Sprint v. Durham                        CV-97-305-JD  08/27/98
              UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF NEW HAMPSHIRE

Sprint Spectrum L.P.,
d/b/a Sprint PCS

     v.                              Civil No. 97-305-JD

Town of Durham, NH, et al.


              M E M O R A N D U M   O P I N I O N


     The plaintiff, Sprint Spectrum L.P., d/b/a Sprint PCS

("Sprint"), brought this action against the defendants, the Town

of Durham, New Hampshire ("Town" or "Durham"), and the Planning

Board of Durham, New Hampshire ("Planning Board").  The plaintiff

alleges that the defendants violated the Telecommunications Act

of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56 (1996), and

breached a contract between the parties in connection with the

plaintiff's attempt to locate personal communication service

("PCS") facilities in Durham.  Before the court are the

defendants' motion to dismiss (document no. 10), the plaintiff's

motion for summary judgment (document no. 7), and the defendants'

cross-motion for summary judgment (document no. 15).


                           Background[1]

     The plaintiff is developing a digital PCS system in New

_____

     [1]The court herein relates only those material facts that are
relevant to the resolution of the instant motions and that are
not in genuine dispute.

Hampshire as part of a national wireless network.[2]  It first contacted the Town regarding the placement of a PCS facility that would serve Durham on Route 4 at a public works facility.[3]

Durham's Town Administrator suggested that, rather than the public works site, the plaintiff use a site located on the town landfill on Durham Point Road.  The plaintiff tested the site and found that it satisfied the plaintiff's technical requirements. It planned to place an unlighted 190' tower on the site, which would accommodate its own antenna and those of up to three other providers.[4]  It would also provide the communications facilities for the municipal police and fire services.  This plan would allow Durham to limit the total number of towers in town and to gain revenue both from the plaintiff and from any other providers who used the tower for colocation.

The parties then negotiated an option agreement and PCS site agreement for the Durham Point Road site.  The option commenced

[2]The record indicates that PCS, the term used by the plaintiff in its submissions to the court, is a subset of personal wireless services ("PWS"), the term used by the TCA. For the purposes of this order, the two terms are functionally equivalent.

[3]The Durham Town Council is the legislative and governing body of Durham and acts on the Town's behalf.  The court therefore considers the acts of the town council as the acts of the Town.

[4]Currently, at least one telecommunications carrier provides cellular service, a competing technology, to Durham.

on January 23, 1997, and ran until July 23, 1997.  Upon exercise of the option by the plaintiff, the PCS site agreement would become effective.  The PCS site agreement, a land lease for the Durham Point Road site, has an initial term of five years with automatic renewals at the plaintiff's option for four additional five year terms.  The option agreement incorporates the terms of the PCS site agreement and notes that it is subject to compliance with local laws, rules, and regulations.

On January 21, 1997, the Town Council adopted Resolution No. 97-01(A), authorizing the Town Administrator to sign the agreements.  Durham signed the option agreement on January 23.  Later that month, the plaintiff filed for site plan review with the Planning Board.  The plaintiff applied for, and on February 14, 1997, obtained a variance for the Durham Point Road site from the Zoning Board of Adjustment ("ZBA").  On March 5, 1997, the Planning Board formally accepted the plaintiff's application for site plan review.  It appears from the record that Planning Board approval was the only remaining step necessary for the plaintiff's plan to proceed.

Prior to the approval of the site plan by the Planning Board, a ground swell of public sentiment arose against the proposed tower.  Furthermore, the membership of the Town Council changed.  It is not without significance that seven members of the new Council live on Durham Point Road.  For reasons that the

record fails to make completely clear but were, at least in part, related to the public outcry and the change in the Town Council's composition, the defendants began to question the wisdom of the Town Council's agreement with the plaintiff.

The Town realized that the plaintiff was likely to be the first of may new PWS providers seeking to establish facilities in Durham and determined that it would be advantageous to create a unified plan governing all PWS facilities. It decided to adopt an ordinance addressing the subject but needed time to create an appropriate one. Therefore, the Town instituted a moratorium on PWS applications to allow time to develop an ordinance. At least one councilor acknowledged that a moratorium would serve as a "roadblock" to the construction of towers in Durham. Aff. of Carol Donahue McEleney in Supp. of Pl.'s Mot. for Summ. J. ("McEleney Aff."), Ex. H, at 2-3 (Durham Town Council Meeting Minutes of May 19, 1997) (comment of Councilor Rous).

From the Town's perspective, its agreement with the plaintiff posed at least two concerns. First, the plaintiff's existing application would not be subjected to the new zoning scheme when adopted. Second, the defendants have asserted that they were concerned about the accuracy of factual representations made by the plaintiff during the course of negotiating the agreement. The defendants determined that it would be advantageous to terminate the application process begun by the

4

agreement and force the plaintiff to reapply under whatever ordinance was ultimately adopted. As one councilor stated, he was "in favor of stopping this mess here and starting over." Id. at 12 (comment of Councilor Valena).

By public notice posted May 9, 1997, the Planning Board posted a proposed amendment to the Town's zoning ordinance regarding wireless telecommunications facilities. On May 19, 1997, in response to a citizen initiative petition, the Town Council voted to revoke Resolution No. 97-01(A). The Council took the position that this revocation terminated the option agreement and PCS site agreement. On May 21, 1997, the Planning Board voted to declare that the Town Council's revocation of the resolution and termination of the contract rendered moot the current site planning application for the plaintiff at the Durham Point Road site.

At the Town Council's June 2, 1997, meeting, it voted to send a letter to the Durham Zoning Board of Adjustment ("ZBA") declaring the Council's position that it was not in the Town's interest for the ZBA to grant any variances for telecommunications facilities until the lifting of the moratorium and the enactment of a new zoning ordinance. On June 18, 1997, the plaintiff brought this action. Despite the defendants' purported revocation of the agreement, the plaintiff attempted to exercise the option by letter dated June 24, 1997, and tendered the first

month's rent.  The Town returned the notice and the rent check.

On June 28, 1997, the Town Council enacted a moratorium on the acceptance or processing of applications for permits, or the issuance of permits, for PWS facilities for a period of no longer than 180 days or upon posting of a zoning amendment permitting the siting of such facilities, whichever occurred first.  The plaintiff amended its complaint to add allegations that the moratorium violated the TCA.  The moratorium expired on December 19, 1997.

The plaintiff did not submit any additional applications to the Town Council, Planning Board, Zoning Board of Adjustment, or any other board or committee of the Town during the pendency of the moratorium.  Because the Planning Board had declared its site plan application moot, the plaintiff did not have any applications pending for any permits or other zoning licenses on June 28, 1997, the date that the option expired.  The plaintiff thus did not obtain approval from the Planning Board to site its facility during the term of the option agreement.  An amendment to the Durham Zoning Ordinance, "Article 13 - Personal Wireless Service Facilities Overlay District," was adopted by the Durham Town Council on February 2, 1998.  The defendants have taken the position that to place a PCS tower in Durham, the plaintiff must reapply and gain approval under the new ordinance.

The plaintiff's amended complaint includes the following

counts:  in counts I and II, the plaintiff claims that the Town

Council and Planning Board, respectively, violated the TCA; in

count V, the plaintiff asserts that the Planning Board violated

N.H. Rev. Stat. Ann. ("RSA") § 676:12; in count VI, the plaintiff

asserts that the Town Council breached its contract with the

plaintiff; and in count VII, the plaintiff asserts that the Town

Council breached the implied covenant of good faith and fair

dealing.[5]  The court now considers the pending dispositive

motions.[6]

---

[5]The plaintiff has voluntarily withdrawn its claims in counts III and IV for alleged due process violations by the Town Council and Planning Board, respectively.

[6]Throughout the pendency of this action, the court urged the parties to attempt to find a mutually agreeable resolution to their dispute.  When it appeared that the possibilities for such resolution had been exhausted, the court heard oral argument on the pending motions on March 2, 1998 and gave the parties additional time to file supplemental memoranda.  Prior to the court's ruling, the parties informed the court that they had continued to discuss settlement and requested that the court stay its decision for thirty days.  The court gave the parties until June 22, 1998, to file a settlement stipulation, and later extended the deadline until July 23, 1998, at the request of the parties.  On August 3, 1998, after the expiration of the stay, the plaintiff filed a status report indicating that the parties have been unable to reach a settlement.  The pending motions are therefore ready for ruling.

7

Both parties have moved for summary judgment.[7] The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties seeking summary judgment bear the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light

---

[7]The defendants also filed a motion to dismiss the plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. However, before the court ruled on the motion to dismiss, the defendants filed a cross-motion for summary judgment. The defendants' cross-motion reiterates and expands the arguments initially presented in the motion to dismiss. The court deems the motion to dismiss to be superceded by the summary judgment motion and therefore denies the motion, but considers the arguments raised there as a supplement to the cross-motion for summary judgment.

most favorable to the non-moving party, "'indulging all reasonable inferences in that party's favor.'" <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)). However, once a moving party has submitted a properly supported motion for summary judgment, the non-moving party "may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). Summary judgment is thus appropriate where the material facts are not in dispute and the motions present solely an issue of law. <u>See</u> <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997). Here, although the parties differ as to the characterization and significance of certain facts, the material facts are undisputed and resolution of the case on summary judgment is appropriate.

The TCA was signed into law on February 8, 1996. <u>See</u> <u>Sprint Spectrum L.P. v. Town of Easton</u>, 982 F. Supp. 47, 49 (D. Mass. 1997). It was passed

> in order to provide a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommuni-cations markets to competition. More specifically, with this Act, Congress had tried to stop local authorities from keeping wireless providers tied up in the hearing process.

9

The legislative history evidences clear Congressional intent to take down the barriers to telecommunications . . . .

Recognizing that such sweeping changes in the industry may be met with resistance, federal lawmakers limited the ability of state and local officials to delay implementation of the TCA. Specifically, Section 704 of the TCA states that actions taken by State or local governments shall not prohibit, or have the effect of prohibiting, the placement, construction or modification of personal wireless services.

Id. at 49-50 (quotations, citations, and alterations omitted).

Subsection 7 of 47 U.S.C. § 332(c) is captioned "Preservation of local zoning authority." See 47 U.S.C.A. § 332(c)(7) (West Supp. 1998). It provides, in relevant part, as follows:

(A)  General Authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B)  Limitations

(i)  The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

10

(ii)  A State or local government or instru-
mentality thereof shall act on any request for
authorization to place, construct, or modify personal
wireless service facilities within a reasonable period
of time after the request is duly filed with such
government or instrumentality, taking into account the
nature and scope of such request.

(iii)  Any decision by a State or local govern-
ment or instrumentality thereof to deny a request to
place, construct, or modify personal wireless service
facilities shall be in writing and supported by
substantial evidence contained in a written record.

(iv)  No State or local government or in-
strumentality thereof may regulate the placement,
construction, and modification of personal wireless
service facilities on the basis of the environmental
effects of radio frequency emissions to the extent that
such facilities comply with the [Federal Communica-
tions] Commission's regulations concerning such
emissions.

.  .  .  .

47 U.S.C.A. § 332(c)(7)(A)-(B) (West Supp. 1998).  Although

Congress in section A purportedly preserved local governmental

authority over placement, construction, and modification

decisions, that authority is clearly curtailed by the provisions

of section B.  The TCA works sweeping changes in local zoning

authority because it "clearly preempts any state regulations

'which conflict with its provisions.'"  Lucas v. Planning Bd. of

LaGrange, No. 98 CIV. 0862(CLB), 1998 WL 261566, at *9-10

(S.D.N.Y. May 19, 1998) (holding provisions of New York State

Environmental Quality Review Act invalid as preempted by TCA)

(quoting Easton, 982 F. Supp. at 50).  The TCA essentially

mandates a policy of constructive engagement for towns and municipalities in permitting PWS providers. Municipalities no longer have the option of simply refusing to accommodate these entities, but must instead actively work towards a resolution that allows the construction of these facilities while simultaneously addressing the concerns of the municipalities in a manner consistent with the requirements of the TCA.

Despite the statute's relatively recent enactment, a number of district courts have considered its application. See, e.g., AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, No. 1:97CVO1246, 1998 WL 337748 (M.D.N.C. June 12, 1998), stay denied by 1998 WL 409382 (M.D.N.C. July 17, 1998); Omnipoint Communications, Inc. v. Zoning Hr'g Bd. of East Pennsboro Township, 4 F. Supp. 2d 366 (M.D. Pa. 1998); Gearson & Co. v. Fulton County, No. CIV.A.1:97CV3231WBH, 1998 WL 292095 (N.D. Ga. Apr. 23, 1998); Cellco Partnership v. Town Plan and Zoning Comm'n of Farmington, 3 F. Supp. 2d 178, 1998 WL 220030 (D. Conn. Apr. 13, 1998); Sprint Spectrum L.P. v. Willoth, 996 F. Supp. 253 (W.D.N.Y. 1998); Smart SMR of N.Y., Inc. v. Zoning Comm'n of Stratford, 995 F. Supp. 52 (D. Conn. 1998); Virginia Metronet, Inc. v. Board of Supervisors of James City County, 984 F. Supp. 966 (E.D. Va. 1998); AT&T Wireless Servs. of Fla., Inc. v. Orange County, 994 F. Supp. 1422 (M.D. Fla. 1997) ("Orange County II"); AT&T Wireless Servs. of Fla. v. Orange County, 982

12

F. Supp. 856 (M.D. Fla. 1997) ("Orange County I"); Century Cellunet of S. Mich., Inc. v. City of Ferrysburg, 993 F. Supp. 1072 (W.D. Mich. 1997); Sprint Spectrum L.P. v. Zoning Hr'g Bd. of East Nottingham Township, No. CIV.A.97-1837, 1997 WL 688816 (E.D. Pa. Oct. 15, 1997); Easton, 982 F. Supp. 47; Sprint Spectrum L.P. v. Town of Farmington, No. 3:97 CV 863 (GLG), 1997 WL 631104 (D. Conn. Oct. 6, 1997); AT&T Wireless PCS, Inc. v. City Council of Virginia Beach, 979 F. Supp. 416 (E.D. Va. 1997); OPM-USA-INC. v. Board of County Comm'rs of Brevard County, No. 97-408-CIV-ORL-19, 1997 WL 907911 (M.D. Fla. Aug 26, 1997); Sprint Spectrum L.P. v. Jefferson County, 968 F. Supp. 1457 (N.D. Ala. 1997); Illinois RSA No. 3 v. County of Peoria, 963 F. Supp. 732 (C.D. Ill. 1997); Western PCS II Corp. v. Extraterritorial Zoning Auth., 957 F. Supp. 1230 (D.N.M. 1997); BellSouth Mobility Inc. v. Gwinnett County, 944 F. Supp. 923 (N.D. Ga. 1996); Sprint Spectrum, L.P. v. City of Medina, 924 F. Supp. 1036 (W.D. Wash. 1996). To date, the Circuit Courts have not ruled upon this provision of the TCA, but this court has recently done so. See Omnipoint Communications Enters. v. Town of Amherst, Civil No. 97-614-JD (D.N.H. Aug. 21, 1998). Against this background, the court considers the following issues raised by the parties' cross-motions for summary judgment: (1) whether the TCA is properly applicable to the acts of the defendants; (2) if the TCA is applicable to the acts of the defendants, whether the

13

defendants' actions satisfy the requirements of a written denial supported by substantial evidence in a written record; (3) if the defendants violated the TCA, what remedy is appropriate; and (4) what is the appropriate disposition of the supplemental state law claims.  The court discusses these issues seriatim.

A.    Applicability of the TCA to the Acts of the Defendants

The TCA applies not only to explicit, formal denials of requests to place, construct, or modify PWS facilities, but also to acts that have the effect of a denial.  See, e.g., Jefferson County, 968 F. Supp. at 1468 ("The County's refusal to act during the sway of a series of moratoria emits more than just an 'aroma of obstruction':  it is tantamount to denial of plaintiffs' applications.") (citations omitted).  In this case, the defendants assert that the TCA does not apply to their acts for a variety of reasons.  They contend that the TCA applies only to the exercise of zoning power by local government and does not apply to a local government acting in its proprietary capacity, as they allege they did here.  They further assert that their actions do not fall under the TCA because they did not deny any request by the plaintiff to place a PWS facility.  The defendants contend that their reasons for revoking the option are not regulated by the TCA, and even if they were, the reasons were legitimate because the defendants did not consider the effect of

14

radio frequency emissions in their decisions.  The plaintiff asserts that the acts of the defendants are cognizable under the TCA.

The plaintiff requested permission to locate a PCS tower at the Durham Point Road facility and filed applications to do so. While the approval process was ongoing and in the face of significant pressure from the public and individual council and board members, the defendants determined that they did not want to give approval to any PWS facility until they had enacted a comprehensive zoning ordinance.  They curtailed consideration of additional applications, but realized that the plaintiff's existing application posed a problem for their recently determined goal of having all PWS facilities controlled by a comprehensive zoning scheme.  Therefore, the defendants determined to, and in fact succeeded in, terminating the plaintiff's application and the underlying agreement on which that application was based.  The plaintiff did not withdraw its request voluntarily or otherwise consent to the defendants' actions.  The mechanism used by the defendants to accomplish this result may not have been a formal denial, but it undoubtedly had the direct effect of denying the plaintiff's properly initiated request for permission to locate a PWS facility in Durham.[8]  The

_____

[8]The court need not consider, in this context, whether the revocation was authorized by the agreement itself or by state

15

acts of the defendants are cognizable under the TCA.

The defendants' arguments to the contrary are inapposite. Whether or not the acts of the defendants can be construed as zoning decisions, and for the purposes of this decision the court assumes arguendo that they were not, the text of the TCA does not support the distinction between a local government's zoning and proprietary functions that the defendants seek to read into it. It may well be the case that not all exercises of a town's proprietary functions fall within the scope of the TCA, but the TCA simply does not allow local governments to shield themselves from acts which violate the TCA by characterizing those actions as taken pursuant to a town's proprietary functions. Cf. Easton, 982 F. Supp. at 50 (TCA preempts conflicting state law and regulations). As the court has already noted, the acts of the defendants unquestionably resulted in a denial of the plaintiff's request to locate a PWS facility. The fact that this result was achieved without a formal denial of the plaintiff's applications is of no legal significance. The defendants' final argument that the reasons for its denial were permissible because they did not take into account the effect of radio frequency emissions is also inapposite. Compliance with the TCA's provision against con-sidering radio frequency emissions, see 47 U.S.C.

_____

law. The revocation had the effect of a denial for the purposes of the TCA whether or not it was otherwise lawful.

16

§ 332(c)(7)(B)(iv), does not guarantee that the defendants have not violated another of the TCA's requirements, see 47 U.S.C. § 332(c)(7)(B)(i)-(iii). None of the cases cited by the defendants in support of their arguments dictate a result to the contrary.

The court concludes that the acts of the defendants fall within the scope of the TCA, and the court may properly consider whether the defendants' conduct violated the TCA.

B.    Written Decision Supported by Substantial Evidence Contained in a Written Record

The TCA also provides the following:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C.A. § 332(7)(B)(iii) (West Supp. 1998). The substantial evidence standard "'requires governing bodies to produce a written decision, detailing the reasons for the decision and the evidence that led to the decision.'" Cellco Partnership, 1998 WL 220030, at *5 (finding that denial was not supported by substantial evidence in written record) (quoting Virginia Metronet, 984 F. Supp. at 972). Although a telecommunications provider must come forward with a certain minimal amount of information in support of its applications in order to prevail,

17

once an application has been supported this provision places the burden of proof to support any denial on the local government entity issuing the denial.  Compare Smart SMR, 995 F. Supp. at 56, and Easton, 982 F. Supp. at 52 ("[B]ecause the TCA effectively preempts state law in several respects, including the burden of proof, . . . it is the [defendant's] burden to produce substantial evidence supporting its denial of plaintiff's application.") (internal quotation omitted), with Gearson, 1998 WL 292095, at *3 (court dismissed plaintiff's claim that defendants' denial of its application to erect a tower violated TCA based on plaintiff's complete failure to submit necessary supporting information).  If a decision "does not set forth the zoning authority's rationale, this 'ground alone is sufficient to quash the [zoning authority's] decision.'"  Smart SMR, 995 F. Supp. at 56 (quoting Orange County I, 982 F. Supp at 859) (alteration in original).

Although the nature of the inquiry into whether a denial is supported by substantial evidence is highly fact-specific, certain general principles have been established.  To withstand judicial scrutiny a denial must be specific and detailed, for courts have found denials based on generalized aesthetic and safety concerns to be insufficient to meet the substantial evidence standard.  See Easton, 982 F. Supp. at 52; BellSouth Mobility, 944 F. Supp. at 928.  As one court has stated:

18

> [L]ocal governments may not mask hostility to wireless communications facilities with unreasoned denials that make only vague references to applicable legal standards. The procedural requirement of a written decision with articulated reasons based on record evidence forces local governments to rely on supportable neutral principles if they wish to deny a particular wireless installation.

Orange County I, 982 F. Supp. at 862. In addition, where a party has done everything possible to support an application and "it appears from the record that there is nothing [the applicant] could have done which would have met with the approval of the [local authority,]" a denial under those circumstances is not based on substantial evidence in a written record. OPM-USA, 1997 WL 907911, at *11.

In this case, the defendants contend that the TCA requirement that they produce a written decision supported by substantial evidence in a written record does not apply to this case because their acts did not constitute a "denial" for purposes of the TCA. As discussed in the preceding section, however, the defendants' argument fails because their acts unquestionably had the direct effect of a denial. See Jefferson County, 968 F. Supp. at 1468. As such, the denial had to be in writing and supported by substantial evidence based in a written record. See 47 U.S.C.A. § 332(c)(7)(B)(iii).

The defendants' actions fail to comply with even the most basic elements of this requirement. The denial was not "in

19

writing" within the meaning of the TCA because it did not indicate the reason for the denial. Furthermore, to the extent that the reasons for the denial can be gleaned from the record in this case, the denial lacks the support of any substantial evidence. Indeed, the record indicates that the denial was the product of open and vocal hostility both to towers in general and specifically to the plaintiff's tower proposal. Such hostility is not a permissible grounds for denying an application, even if the denial otherwise satisfied the formal requirements of 47 U.S.C. § 332(c)(7)(B)(iii), which it does not. Therefore, the court concludes that the defendants' actions violated the TCA.[9]

C.    Appropriate Remedy

Given the court's conclusion that the defendants violated the TCA by failing to issue the denial in writing with the support of substantial evidence in a written record, the court must consider the issue of an appropriate remedy to correct the violation. Congress when it enacted the TCA did not specify what the remedy for a violation of its provisions would be. See BellSouth Mobility, 944 F. Supp. at 929. The two basic choices

---

[9]Because the court has concluded that the defendants' rejection of the plaintiff's application violated 47 U.S.C. § 332(c)(7)(B)(iii), it need not consider the plaintiff's argument that the defendants violated the TCA in several additional respects.

20

of remedy employed by courts after finding a TCA violation are: (1) remand to the local authority for additional consideration or reconsideration; or (2) mandatory injunctive relief, usually in the form of an order granting the improperly denied applications. See, e.g., Virginia Beach, 979 F. Supp. at 430; BellSouth Mobility, 944 F. Supp. at 929.[10]

In choosing between a remand and injunctive relief, several courts have determined that

> simply remanding the matter to [the relevant local authority] for their determination would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis.

Id.; accord Easton, 982 F. Supp. at 52; Western PCS, 957 F. Supp. at 1237. In addition to the statutory requirement that local governments act on applications within a reasonable time, see 47 U.S.C.A. § 332(c)(7)(B)(ii), the TCA also directs the court to resolve TCA claims on an expedited basis, see 47 U.S.C.A. § 332(c)(7)(B)(v). Remand is particularly inappropriate where the case would go back before a local government that has already

---

[10]Despite the fact that several courts have purported to issue writs of mandamus, the court notes that the writ of mandamus has been abolished in United States district court. See Fed. R. Civ. P. 81(b); see also Virginia Beach, 979 F. Supp. at 430 & n.25 (granting mandatory injunction); cf., e.g., Western PCS, 957 F. Supp. at 1239 (granting mandamus); Jefferson County, 968 F. Supp. at 1469 (same); BellSouth Mobility, 944 F. Supp. at 929 (same). The effect of mandatory injunctive relief, however, is the same as the effect of a writ of mandamus. See Virginia Beach, 979 F. Supp. at 430-31.

demonstrated hostility toward the application.  See Virginia Beach, 979 F. Supp. at 431.

The court concludes that remanding this case to the defendants would be inconsistent with the purposes of the TCA. The defendants have expressed hostility toward the plaintiff's application and have sought to impose on the application the requirements of an ordinance adopted since the commencement of this action.  Durham has had ample opportunity to address the plaintiff's application on its merits and has failed to comply with the TCA.  A remand would allow further delay and in all probability would result in another denial of the plaintiff's application.  Therefore, the court holds that mandatory injunctive relief ordering the defendants to approve the plaintiff's application and remove any barriers to the construction of the proposed tower is the appropriate remedy.

The option agreement and PCS site agreement, which initially were to be the documents that controlled the terms of the relationship between the parties, were purportedly revoked by the Town Council.  The revocation, however, was part of a course of conduct that violated the TCA.  To the extent that the defendants violated the TCA, the revocation is null and void.  The relief herein granted relates back to June 24, 1997, the date that the plaintiff attempted to exercise the option.  The PCS site agreement shall remain effective as if the plaintiffs had

successfully exercised the option as of that date.


D.    Supplemental State Law Claims

The plaintiffs have also brought state law claims alleging violation of RSA § 676:12 (Count V), breach of contract (Count VI), and breach of the implied covenant of good faith and fair dealing (Count VII).  As an initial matter, the defendants assert that the court should decline to exercise supplemental jurisdiction over the state law claims.  The defendants contend that the gravamen of the plaintiff's complaint is a contract dispute and assert that the issue should properly be adjudicated in state court.  They have unsuccessfully contended that the court lacks jurisdiction over the plaintiff's TCA claims, and on that basis have requested that the court decline to resolve the plaintiff's state law claims.  However, the plaintiff's state law claims clearly arise from the same nucleus of operative facts and form part of the same case or controversy as the TCA claims, thus making exercise of the court's supplemental jurisdiction appropriate.  See Nottingham Township, No. CIV.A.97-1837, 1997 WL 688816, at *1 (E.D. Pa. Oct. 15, 1997).  Therefore, the court properly has jurisdiction over the plaintiff's supplemental state law claims.

With the exception of the award of attorney's fees under the option agreement, the substance of the relief sought by the

plaintiff in the supplemental state law claims has been granted by the court in its ruling on the TCA claims. Therefore, the supplemental state law claims are dismissed as moot. The court expects the parties to make a good faith effort to resolve any disagreement over attorney's fees. Right is reserved to the plaintiff to renew its request for attorney's fees within 30 days if the matter cannot be resolved.

## Conclusion

The plaintiff is entitled to summary judgment on its TCA claim because the defendants denied its application for a PCS tower without a written decision supported by substantial evidence in a written record. A fortiori, the defendants are not entitled to summary judgment. The defendants' Rule 12 motion (document no. 10) and summary judgment motion (document no. 15) are denied. The plaintiff's summary judgment motion (document no. 7) is granted with respect to its TCA claims in counts I and II. The plaintiff's supplemental state law claims in counts V, VI, and VII are dismissed as moot with right reserved to the plaintiff to reopen its claim for attorney's fees under the option agreement if the matter cannot be resolved between the parties within 30 days of this order.

24

O R D E R

The decisions of the defendants denying the plaintiff's application to install a PCS tower on the Durham Point Road site are null and void. The revocation of the option agreement is null and void and the PCS site agreement shall be considered operative between the parties to it as of June 24, 1997. The court orders the Town of Durham, its officers, boards, commissions, departments, town council, and other instrumentalities whose approval may be necessary, to approve the plaintiff's application and remove any further impediments to the plaintiff's construction of the proposed tower at the town landfill on Durham Point Road, including the issuance of any required permits, within forty-five days of the date of this order. The clerk is ordered to close the case, subject to its being reopened within thirty days of the date of this order at the request of the plaintiff if the parties are not able to resolve the plaintiff's claim for attorney's fees under the option agreement.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

August 27, 1998
cc: Jonathan S. Springer, Esquire
    Robert D. Ciandella, Esquire